COONEY, ECKSTEIN & CO. v. F. & J. AUDITORE CO. et al.

FLANNERY v. F. & J. AUDITORE CO.

(District Court, E. D. New York.   July 10, 1914.)

SHIPPING (§ 58*)—CHARTERS—CAPSIZING OF BARGE WHILE LOADING—UNSEA-
WORTHINESS.

A barge, chartered to carry railroad ties, while being loaded from an-
other vessel, showed a list, and subsequently, on receiving another draft
of ties, careened in the other direction and dumped her load, also re-
ceiving some injury.   She had not received all the load she would be ex-
pected to carry from her appearance and dimensions, and the evidence
showed that she was unseaworthy for such load.   It also indicated negli-
gence on the part of the captain, who was the servant of the owner, and
on the part of the contracting stevedores, in the manner of loading, and
in not sooner observing the list and taking measures accordingly.   *Held*,
that the charterer was not in fault, and was entitled to recover for the
ties lost from the owner and stevedores, and that the owner was entitled
to half damages for the injury to the barge from the stevedores.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 233-244, 314,
327; Dec. Dig. § 58.*]

In Admiralty.   Suits by Cooney, Eckstein & Co. against the F. &
J. Auditore Company, with Daniel B. Flannery, impleaded, and by
Daniel B. Flannery, owner of the barge Evelyn, against the F. & J.
Auditore Company.   Decree for Cooney, Eckstein & Co. against both
other parties, and for Flannery against the F. & J. Auditore Company
for half damages.

Harrington, Bigham & Englar, of New York City, for Cooney, Eck-
stein & Co.

James J. Macklin, of New York City, for Daniel B. Flannery.

Cass & Apfel, of New York City, for F. & J. Auditore Co.

CHATFIELD, District Judge.   The Evelyn is a comparatively new
barge, with a deck space between bulkheads 87 feet 5 inches long and
31 feet 2 inches wide.   The bulkheads are 8 feet high.   She measures
10 feet 1½ inches in depth below the deck, and is substantially 102
feet in length over all.   She was chartered by her owner, Daniel B.
Flannery, to the Moran Towing Company for cargo carrying around
the harbor of New York, and was in turn rechartered to Cooney, Eck-
stein & Co. for the purpose of transporting railroad ties.

Upon the voyage in question, she was, on July 27, 1912, alongside
the steamer Yaguez, from which a load of railroad ties was being
taken by the F. & J. Auditore Company, contract stevedores.   These
ties were of two dimensions, some 8½ feet long by 9 by 7 inches, and
some 8 feet long by 6 by 8 inches.   Other boats had received loads of
ties.   One of them was lying close by waiting to be towed away.   At
about 9:30 a. m. the Evelyn showed a list to starboard, bringing her
wearing piece down to the water, and putting her port rail or wearing
piece 4 feet out of water.   The captain of the barge was then making
motions, or signals, to the stevedores.   Another draft of ties was
landed upon the deck, the boat careened in the other direction, and the

load was dumped. As many of the ties as could be found were salvaged by various boats, and from the computation of the entire cargo, deducting the amount taken upon other barges, the proof shows that 1,404 ties were unaccounted for, 2,678 were found upon board of the Evelyn, and 6,335 were accounted for by the salvage operations. This makes a total, if the figures be correct, of 10,417 ties upon the Evelyn at the time of her capsizing.

On December 12, 1912, Cooney, Eckstein & Co. filed a libel against the Auditore Company, charging them with the loss of the cargo through alleged negligent loading of the Evelyn. The stevedores answered, and filed a petition bringing in the owner of the boat. They alleged the fault to be that of the boat, or of the servants of the owner or charterer, and denied the charge of negligence against themselves.

On December 14, 1914, a second suit was brought by Flannery, the owner of the Evelyn, against the Auditore Company as stevedores, for damage to the Evelyn through alleged negligent loading. The Auditore Company, by petition, brought in Cooney, Eckstein & Co. in this action, and again alleged that they were given an unseaworthy or improperly ballasted boat, and that the servants of the owner or charterer were negligent.

It appeared upon the trial that the stevedores were performing their work, taking the load out in slings through the use of a winch in the ordinary manner. Men were at work upon the deck and in the hold of the Yaguez, and the draft was lowered to the barge by a signal from a man upon the deck of the steamer. He in turn received a signal from those upon the deck of the Evelyn, where some of the stevedores were distributing and piling the load, and the foreman of the stevedores' gang was overseeing all the operations. He testifies that at the time in question he thought that the Evelyn "looked funny." She began to show a list, and he went down upon her to see what was the matter. Just at that time, before they could trim her to an even keel, the descent of another draft threw her in the other direction, and she capsized. The testimony of the captain of the boat is to the same effect.

The stevedores talked Italian, and the captain of the boat was a Swede. He testifies that the Italians did not regard his suggestions and warnings, but he and the stevedores agree to the proposition that the Evelyn had not received as much load as they anticipated she would carry when the tendency to list began to appear. The captain testifies that the Evelyn should carry from 11,000 to 12,000 ties. He also said that the stevedores loaded the outside tiers of the Evelyn, which were laid thwartships, after they had reached the level of the top of the rail, by shoving out the outer end of the ties until they were even with the outside edge of the rail, and then carrying the pile up in a vertical line, instead of setting back each tier and placing a row of headers under the pile, so as to incline the load toward the center of the boat. The inside tiers of the load were laid in fore and aft, but, according to the captain, none of the layers or tiers were placed in a cross direction, so as to make a crib or to anchor the load. The captain testifies that the outside tiers were carelessly placed, so that some

of the ties projected. If the dumping had occurred through a shifting or tumbling down of these outside tiers of ties, a different question would have been presented. But the captain charges the tendency to list (that is, tenderness in carrying the load) to the extra weight thus put upon the boat, further from the amidships line than when loaded in the ordinary manner, and interfering with the stability of the boat as this extra load was carried up vertically, higher and higher above the keel.

Extra weight as far out as the rail and at a considerable level above the deck would affect the balance or equilibrium of the boat. Mere extra weight upon both sides of the boat, above and far from the keel, would of itself increase the liability to rock, but would not have the effect of establishing a list, unless some excess of weight was present or added to one side.

The captain of the Philip was catching "lemons" in the water and watching the Evelyn. He stated that she was listed for half an hour before she went over.

The testimony of the captain, to the effect that, while a list existed and before it had been corrected by trimming the load, an additional draft of ties caused the boat to upset, seemed so incredible, if the boat was capable of carrying more load with slight differences in placing, that further testimony was taken and an actual test made of the Evelyn, in the month of February, 1914, with a cargo of ties brought to the port of New York upon another steamer then in process of unloading by the Auditore Company.

The owner of the Evelyn, Mr. Flannery, superintended the method of loading and determined when the boat had a sufficient load. The work of loading the boat and making the test was done by the Auditore Company. The ties were weighed and counted, and 1,685 ties, 7 inches by 9 inches by 8½ feet, were placed upon the boat; 4,330 ties, 6 inches by 8 inches by 8 feet, were added to the load. Two small ties were tested, and found to weigh 136 and 138 pounds, while three large ties weighed 168 pounds, 191½ pounds, and 215 pounds, respectively. Averaging this weight at 137 pounds for the small ties and 191½ pounds for the large ties, we have a total of but 413 tons for the 6,015 ties, which brought the boat to within one foot of the wearing strip.

Upon the trial Mr. Flannery testified that the Evelyn would carry 725 long tons of general cargo (but not ties). Upon being recalled after the test, he testified that he had misspoken, and that "short" tons were meant. A witness, Stockham, called as an expert, estimated that the Evelyn ought to carry about 8,000 ties of the smaller size. The difference in weight in the test load, between 1,685 large ties and the same number of smaller ones, would amount to about 500 small ties. Stockham (who was present) estimated that the boat at the test might have carried 500 more, bringing her total up to 7,015, instead of the 8,000 which the expert estimated she should carry. But all of these figures are far short of the amount (over 10,000 ties) with which she was apparently loaded at the time the accident occurred.

This testimony would indicate that some error may have existed in

the total figures of the ties unloaded from the steamer, as the Evelyn was said to have had her wearing piece two feet above water shortly before the accident. But, taking also into account the snow and ice, and the difference of the weight of the ties in winter from their weight in dry weather or in summer, the conclusion must be reached that the preponderance of testimony in each case is to the effect that the accident was caused from attempting to place upon the Evelyn an overload, or excess load, and that she was not a seaworthy boat with the amount of load upon her which she was made to carry, or even with that which, according to the experts called, she apparently should carry. Mr. Auditore, the foreman of stevedores, is a man of considerable experience, and his testimony was to the effect that he expected the Evelyn to be able to carry more load than she had on, and that he had not considered her condition, as she had not reached her limit prior to the accident, in his opinion. One witness testified that she could carry from 11,000 to 12,000 ties.

It would seem from the foregong that Cooney, Eckstein & Co., as charterers, are not responsible for the accident, nor are they responsible to Mr. Flannery for failing to return the boat to him in perfect condition. Any liability that might rest upon them under their charter has been passed on to the Auditore Company, if the fault was that of the Auditore Company in improperly loading the boat; while Cooney, Eckstein & Co. would not be responsible for an accident occurring to the boat from some defect or lack of carrying capacity, which could not be ascertained by them on reasonable inspection, but which should have been known to the owner and guarded against by him, or which, if not known or reasonably ascertainable by him, would be something for which he could not hold the charterers responsible, if accident resulted therefrom.

The loading was done in the ordinary way, and the method of loading or of piling the ties was not of itself sufficient to explain the accident. It would seem that the carrying capacity of the boat differed, under actual measurement, and as figured out from her displacement and proportions, from the capacity which would be estimated from the displacement and size alone. It could not be expected that a·charterer should test every vessel, to see if her carrying capacity was fully up to the customary standard. Ordinary and reasonable inspection and judgment during loading, and with respect to the kind of use, could be relied upon in determining when loading should cease. But the owner (and in this case the owner's representative upon the boat, the captain) was responsible for knowing the peculiarities and capacity of the boat, and any fault through unseaworthiness of the boat, in the sense of inability to carry an apparently normal load, would be a defect for which the owner must be held responsible, if that defect were not communicated to the charterer, or were not ascertainable by him upon reasonable use and inspection. The stevedores were bound to use the ordinary amount of care in stowing the cargo and handling and using the boat, and were also responsible for keeping watch of the general effect of their operations and the situation and condition of the boat as they went along.

In the present case some carelessness is indicated by the fact that they piled the tiers of ties in the manner in which this load was placed. The additional evidence that loading was continued while the boat was listed, and that the last draft was placed at such a point upon the boat as to affect its equilibrium, indicates that the stevedores did not use proper precaution to prevent the accident. They did not anticipate any such happening, yet it was apparently indicated, and might have been apprehended, if they had been observant of the condition of the barge, and if they had not relied entirely upon the captain of the barge to tell them when to stop loading.

There would seem to be fault on their part, and also on the part of the captain, who was in that respect the servant of the owner. The barge was unseaworthy, or not sufficiently ballasted for the particular use and for the size of load which she would reasonably be expected to carry, from her appearance and dimensions. The stevedores were careless in the management and observation of the barge when she approached the point of being fully loaded, and the damage suffered should be borne by both.

A decree for the ties lost will be awarded to Cooney, Eckstein & Co. against both Flannery and the Auditore Company, and one-half the cost of repairs of the barge will be awarded Flannery against the Auditore Company. Cooney, Eckstein & Co. may have one bill of costs, divided between the two parties.